WALTER P. COLEMAN, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 11753.    Promulgated October 31, 1927.

1. On the evidence, *held* that stock acquired by petitioner was not received in an exchange of property but was earned under a contract and is income to the extent of its fair market value when received.

2. Deductions for alleged traveling expenses disallowed because of insufficient evidence.

3. A loss for stock alleged to have become worthless in 1919 disallowed in absence of evidence that the loss was sustained.

*Thomas E. Scott, Esq.*, for the petitioner.
*W. F. Wattles, Esq.*, for the respondent.

This proceeding is for the determination of deficiencies in income tax as stated in a deficiency letter dated December 11, 1925, to be—

| Year | Deficiency | Overassessment |
|------|-----------|----------------|
| 1919 | | $31.34 |
| 1920 | $582.35 | |
| 1921 | 214.57 | |
| | 795.92 | 13.34 |

By letter of January 27, 1926, the overassessment for the year 1919 was increased to $134.65. It arises from the partial disallowance of a claim for abatement.

The petitioner asserts the following errors:

(1) The inclusion in income for each of the years involved of certain shares of stock alleged to have been received by the petitioner at various times as gifts.

(2) Failure to allow the deduction of certain alleged traveling expenses in each of the years involved.

(3) Denial of the deduction of losses on stock alleged to have become worthless during 1919.

At the hearing the petitioner abandoned his contention that the stock first mentioned was received as gifts, asserting that it was received in exchange for certain other property.

FINDINGS OF FACT.

The petitioner was, during the years involved, a citizen and resident of Atlanta, Ga. For approximately ten years prior to 1918 he had been engaged as a traveling salesman handling merchandise.

On December 21, 1918, Elmer Oliver, as party of the first part, and the petitioner and R. R. Wright, as parties of the second part, entered into a contract relative to the sale of stock in a corporation to be organized by Oliver and known as the Georgia Welding Co.

The contract recited that Oliver had agreed to subscribe for 450 out of 1,000 shares of stock at $100 par value each, to be issued by the Georgia Welding Co. Oliver's stock was to be paid for by his license to the company for the use of certain patents and patent applications held by him. The patent and patent applications related to split demountable automobile rims.

The contract further recited that Coleman and Wright had agreed to enter into a contract to take charge of and conduct for the Georgia Welding Co. the sale of the remaining 550 shares of its capital stock.

The contract further recited that upon Coleman's and Wright's performance of an agreement therein made that they would sell, 50, 100, and the remaining 400 shares of the company's stock within two successive 90-day periods and one 6-month period, as specified, Oliver would convey to them out of the stock personally held by him 18, 36, and 146 shares, respectively, for each of the three periods mentioned, the stock so conveyed to be divided equally between the recipients.

The sales periods mentioned were to date " from the time said Georgia Welding Co. is in position to deliver valid certificates of stock in said corporation to purchasers and second parties are given notice thereof."

The contract also provided, dependent on certain contingencies, that Coleman and Wright might receive from Oliver additional stock to the amount of 25 shares.

The license granted the Georgia Welding Co. was to be exclusive and perpetual as to 10 States. In the event of Oliver's disposition of other territorial rights or his realization in any other way of further compensation or profits, whether in the form of cash, stock of Georgia Welding Co. or of any other corporation, Coleman and Wright were to share in such additional stock, etc., on the same basis of percentage adopted in this contract. Oliver specifically obligated himself to cause the organization of the Georgia Welding Co. within 30 days from date, with charter provisions which would enable the terms of the contract to be made operative.

Oliver's interest in the prompt sale by Coleman and Wright of the 550 shares to be held by the Georgia Welding Co. is stated to be the benefits he would derive as a stockholder from the company's prompt sale of such shares.

It does not appear that the Georgia Welding Co. ever came into existence.

Some time prior to May 19, 1919, a corporation known as the Oliver Rim Co. was organized. The Oliver Rim Co. acquired certain patent rights relating to the patent and patent applications above described. The capitalization of this company does not appear. Elmer Oliver was president and manager of the Oliver Rim Co.

Under date of May 19, 1919, Elmer Oliver wrote petitioner the following letter:

OLIVER RIM COMPANY,

MANUFACTURERS OF THE OLIVER SPLIT DEMOUNTABLE RIM,

*Empire Building, Atlanta, Georgia, May 19, 1919.*

Mr. W. P. COLEMAN,
      *Atlanta, Georgia.*

DEAR SIR: In consideration of your surrender to me of a contract made between R. R. Wright, yourself and myself, dated about December 20th, I agree to the following proposition.

This Company will pay you twenty (20%) per cent on all stock sold by you and paid for. I will pay you an additional ten (10%) per cent in stock on all such business and further agree to give you an extra thirty (30%) per cent in stock on all sales up to $125,000, said $125,000 in stock to be set aside for you to sell subject, however, to prior sale.

It is understood that the thirty (30%) per cent mentioned above is to be given to you when the sale of the Treasurer's stock is complete.

Yours very truly,

(Signed)      ELMER OLIVER.

The contract of December 21, 1918, was surrendered to Oliver by the petitioner.

On April 1, 1920, Oliver, Coleman, and one D. F. O'Connor entered into the following contract:

THIS CONTRACT, made and entered into this first day of April, 1920, between Elmer Oliver, party of the first part, and W. P. Coleman and D. F. O'Connor, parties of the second part, provides as follows:

Parties of the second part agree to use their best efforts to sell the stock of the OLIVER RIM COMPANY at ($125.00) One Hundred and Twenty-Five Dollars per share, or such other price as may later be determined by the Board of Directors of the company. In consideration of this service party of the first part agrees to pay to parties of the second part, the following bonus, payable only in stock of the Oliver Rim Company, and computed on the basis of the number of shares sold and paid for in cash or collectible notes:

BONUS jointly of ten per cent on the sale of FOUR HUNDRED SHARES, (or FORTY SHARES).

If parties of the second part fail to sell FOUR HUNDRED SHARES, this BONUS shall be only Seven and one-half per cent, provided they sell more than Two Hundred Shares, and only five per cent, if less than Two Hundred shares are sold.

In the event more than Four Hundred shares are sold by parties of the second part, or their agents, they are to receive a straight ten per cent stock bonus, computed as above.

This agreement is to remain in force for six months, or until the balance of the stock which the Oliver Rim Company wishes to sell, and any personal stock the party of the first part might have to offer for sale, has been disposed of.

D. F. O'Connor was a stock salesman who worked with the petitioner in closing certain sales. When the petitioner and O'Connor closed sales together, the commissions earned were divided equally between them. The contract of April 1, 1920, was entered into at the instigation of O'Connor to insure his receiving a share of the commissions.

Under the contracts above mentioned Elmer Oliver conveyed to the petitioner out of the stock held by him personally, certain shares of stock of the Oliver Rim Co., as follows:

| Year. | Number of shares. |
|---|---|
| 1919 | 31 |
| 1920 | 108 |
| 1921 | 231 |
| Total | 370 |

The respondent has included the stock so received in the petitioner's income at a value of $22.22 per share.

During the years involved the petitioner used an automobile owned by himself while traveling as a salesman. He has claimed the following stated deductions as traveling expenses: 1919, $2,300; 1920, $3,700; 1921, $2,998.32.

The petitioner during 1919 kept some memoranda of his traveling expenses, consisting of a weekly or monthly "survey" based on the number of days on the road and the mileage covered. He spent approximately 300 days on the road during that year. When he married in December, 1919, he moved and failed to carry this memoranda along. His income-tax return for 1919 was executed on March 6, 1920, and filed on March 8, 1920.

During 1920 the petitioner's travels were more extensive than during 1919. In 1921 stock sales slackened and the petitioner devoted part of his time to other lines of business.

In 1919, shortly after he commenced selling Oliver Rim Co. stock, the petitioner bought a sport model Paige automobile, costing $2,375. He used this car in traveling until some time in 1921, when he traded it in on the purchase of a Davis car subsequently used in his travels. In addition to the Paige, the petitioner gave some money and some shares of Oliver Rim stock for the Davis.

The traveling expenses above mentioned include hotel and garage bills, meals, motor oil, gas, tires, and other items of automobile upkeep, as well as depreciation. The 1921 claim includes an alleged loss upon the sale of an automobile.

While at home in Atlanta, the petitioner used the automobile for personal purposes.

Some time prior to the years involved the petitioner bought certain stock in a corporation organized to engage in the conduct of an

ostrich farm in Pennsylvania. The enterprise was not successful and a reorganization was effected. The petitioner surrendered his stock in the ostrich farm corporation, and received a certificate for 100 shares of the common stock of the Alta Vista Co., a Delaware corporation. The total cost of this stock to petitioner was $100.

In May, 1919, the petitioner bought at par one share of $100 par value preferred stock of the Cotton Picker Co. of America.

Neither the Alta Vista Co. nor the Cotton Picker Co. of America have ever paid dividends on the petitioner's stock. The petitioner claims a deduction of $200 for 1919, alleging that his stock in both of these corporations became worthless in that year.

#### OPINION.

MARQUETTE: The petitioner contends that the 370 shares of the Oliver Rim Co. stock received by him from Elmer Oliver during the taxable years involved, were given by Oliver solely in exchange for the petitioner's surrender of the contract of December 21, 1918. Receipt of this stock is alleged to be a tax-free exchange under section 202 of the Revenue Acts of 1918 and 1921.

From a record unsatisfactory in many details, we have drawn conclusions of fact which we believe embody substantially the actual circumstances surrounding the petitioner's acquisition of the stock from Oliver.

We believe the fallacy of the petitioner's contention that the stock mentioned was received in an exchange is so obvious as to make extended discussion unwarranted. So far as petitioner's surrender of the contract of December 21, 1918, in return for Oliver's agreement of May 19, 1919, was an exchange, it was an exchange of contracts only and the petitioner received no stock thereby.

Epitomized, the stock received by the petitioner from Oliver, so far as it relates to the contract of May 19, 1919, was not received in exchange for a contract but was earned under a contract received in an exchange. The stock so received, as well as such stock as was received under the contract of April 1, 1920, was income to the extent of its fair market value, which the respondent has determined to be $22.22 per share.

In passing it may be observed that even if the petitioner had established the receipt of the stock in exchange for the contract, we would be unable on the record to afford him any relief since there was no evidence that the contract of December 21, 1918, had any value or that the stock had no readily realizable market value when received.

It is obvious that the petitioner's travels while engaged as a salesman required the expenditure of considerable sums. We think it equally evident that his statements of the amounts of such expenditures are purely estimates. He testified that his 1919 expense records, which were the most complete records he kept, consisted of a weekly or monthly "survey" calculated on the basis of mileage covered and days involved. These records were lost in December, 1919, when he married and moved.

Considering the loss of the records in December, 1919, we are not persuaded that in preparing his 1919 income-tax return, executed March 6, 1920, the petitioner had available his expense memoranda for 1919 from which to compute the deduction claimed.

Evidence as to the traveling and associated expenses for 1920 and 1921, depreciation deductions, and loss upon sale of an automobile, consisted of bare lump-sum statements of the amounts claimed.

The Board has heretofore said in an appeal involving a claim for similar deductions:

> The Board is cognizant of the fact that every detail of a traveling expense account is difficult to keep and prove, and for that reason the Board is prone to give considerable latitude in the matter of evidence tending to prove such accounts. However, there must be something more than a bare estimate to support such a deduction. *Appeal of Barnett Weiss*, 3 B. T. A. 228, 230. See also *Appeal of Sam Israel*, 3 B. T. A. 663.

In *Appeal of Cleveland Home Brewing Co.*, 1 B. T. A. 87, the Board held that depreciation is a question of fact and must be established by proof. This is equally true when the purpose is to establish an alleged loss upon the sale of an automobile. The record is barren of evidence tending to show that a loss was sustained, and it must, therefore, be disallowed.

The petitioner's claim for the deduction of $200 as an alleged loss on worthless stock during 1919 must fail, as have his other contentions, for lack of evidence.

Certain evidence that the Alta Vista Co. became nonoperative during 1919 (through nonpayment of taxes), can not of itself be taken to establish that the stock became worthless in that year or that it has ever become worthless. See *Appeal of George W. Todd*, 3 B. T. A. 327. This is so even though the stock has never paid dividends.

The only evidence relative to the stock of the Cotton Picker Co. of America is that the petitioner held one share purchased at par value of $100 per share, and that this stock has never paid dividends. Such evidence is insufficient to show that a loss was sustained.

*Judgment will be entered for the respondent.*

Considered by PHILLIPS, MILLIKEN, and VAN FOSSAN.